KELLY, APPELLANT, *v.* McCABE, RESPONDENT.

(No. 8382.)

(Submitted November 9, 1943. Decided March 22, 1944.)

[146 Pac. (2d) 770.]

Personal injury action by Leonard Kelly against Dr. B. V. McCabe.

*Messrs. Victor H. Fall, H. L. Maury, A. G. Shone* and *M. Baxter Larson*, for Appellant, submitted a brief; *Mr. Fall* and *Mr. Shone* argued the cause orally.

*Mr. W. L. Clift,* and *Mr. Newell Gough, Jr.,* for Respondent,
*Mr. Clift* argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

This is an action to recover damages for alleged personal injury. The plaintiff at the time of his illness was an employee of the Montana Power Company, his services were rendered in connection with a subsidiary of that company engaged in an irrigation project. The plainntiff lived with his parents in the vicinity of Hauser Lake, and he was usually employed in driving a truck or doing odd jobs. The Montana Power Company was insured under the Workmen's Compensation Act, Rev. Codes 1935, sec. 2816 et seq., and had contracted with Dr. J. M. Flinn, a partner of Dr. McCabe, the defendant, to tend and care for the employees of the company when injured or who became ill while in the line of employment, and under such contract the defendant operated upon the plaintiff for appendicitis.

There appears to be some disagreement between the parties as to the application of the provisions of the contract between Dr. Flinn and the Montana Power Company in so far as the plaintiff is concerned. This phase of the situation is expressed by plaintiff's counsel in a statement made at the commencement of the trial where it was said, ''The complaint doesn't charge that Dr. McCabe rendered the service under the hospital contract; the complaint charges that the plaintiff was an employee of the Montana Power Company; that he paid a dollar a month for medical and surgical attendance, * * *. When the plaintiff took sick, he was sent by the Montana Power Company * * * directly to Dr. McCabe * * * he didn't know Dr. McCabe or Dr. Flinn but he went to the office they directed him to. Dr. Flinn wasn't there; and he didn't know Dr. McCabe. * * * When he went in and said he was an employee of the Montana Power Company, Dr. McCabe accepted the job and rendered treatment after diagnosis. If that was the contract, whether it was under the Workmen's Compensation Act, or not, is a question for the court to determine under the facts. But, as far as that is concerned, our client anticipated and contemplated in the beginning, at the time when the Montana Power sent him there that was the doctor he had been paying his dollar a month to. That is how it originated. I don't

think there is anything serious in the point from either aspect." It was agreed that the plaintiff paid Dr. McCabe nothing for the medical and surgical services rendered by him to the plaintiff, the contention being that the one dollar per month withheld from plaintiff's wages for hospitalization, etc., entitled him to such services.

The merits of plaintiff's case are predicated upon the following allegations of his complaint: "That the said defendant, between the 29th day of April, 1936, and the 19th day of November, 1936, the exact time being to this plaintiff unknown, failed and neglected to use due and proper care and skill, in that the said defendant did carelessly and negligently place in plaintiff's abdomen a certain strip of gauze about six inches in length, and about one-half inch in width, and did thereafter carelessly and negligently fail to remove said strip of gauze * * *. That by reason of the careless and negligent acts of the defendant, aforesaid, the operative incision or wound became infected and the infection, caused thereby, ate away the muscles of the abdomen and broke down the walls of the abdomen and caused adhesions therein and thereabout, and the operative incision or wound failed to heal and remained an open running sore which exuded matter continuously."

A general and special demurrer to the complaint was overruled. The answer was a general denial followed by a detailed pleading in the nature of an affirmative defense relative to the Montana Power Company having enrolled under the Workmen's Compensation Act long prior to the illness of the plaintiff, and sets out the contract with Dr. Flinn heretofore mentioned, and plaintiff's written assent to abide by the provisions of the Workmen's Compensation Act.

By reply plaintiff in effect denied that Dr. McCabe had any right to perform any duties imposed upon Dr. Flinn under the contract between the latter and the Montana Power.

By stipulation of the parties, the cause was tried to the court sitting without a jury.

The testimony of a number of ·witnesses was received in evidence along with certain exhibits, the latter being certified up. Extended briefs were filed, the matter was under consideration for some weeks and the court on March 13, 1942, filed its findings of fact, conclusions of law and decree dismissing the plaintiff's amended complaint with judgment in favor of defendant with costs. The plaintiff appealed.

The case turns upon the one question as to whether or not the defendant pressed into the operating incision in plaintiff's stomach at any time while the plaintiff was being treated and cared for by the defendant a piece of gauze approximately six inches long and a half inch wide and failed to remove the same, and that such act resulted in the plaintiff's long illness with the attendant suffering and heavy expense.

The facts are these: The plaintiff was under the medical care of Doctors McCabe and Flinn, chiefly Dr. McCabe, from the time of the first operation, April 29, 1936, until November, 1936. The plaintiff testified that he went to Dr. Berg in February or March, 1937, and was under his care until the following August. The record shows there is a period from November, 1936, to March, 1937, where it does not appear that the plaintiff received medical attention from any one. Dr. Gallivan treated him from November, 1937, to November, 1938, and in November he left Dr. Gallivan and went immediately to Thompson, Klein & Cashmore's clinic. During the time, approximately three years, that the plaintiff was under the care of the various physicians and surgeons he worked one summer for three months and another summer for about two months.

Dr. McCabe performed two operations on the plaintiff, both relative to the one affliction; the first April 29, 1936, and the second on or about August 11, 1936. The plaintiff was brought to the city and taken to Dr. McCabe's office in the afternoon of April 28, 1936, in a car driven by his mother, and the latter explained the illness of the son to the doctor. On examination, Dr. McCabe found the plaintiff had a temperature of 103 degrees and pulse of 110, with distended abdomen, and was suffering

from pain in the lower part of the abdomen. The doctor diagnosed the case as ''on old ruptured appendix, with peritonitis'' and ordered the patient to St. John's hospital, where he was driven by his mother.

The following is quoted from Dr. McCabe's testimony as it appears in the record:

''A. The case was admitted to the hospital at 5:30 P .M., on the 28th of April, 1936 and I saw the case first at the hospital before 6:00 o'clock the same day and gave orders for preparation for surgery. The orders were a white blood count, urinalysis, ice-packs to the abdomen and sodium-amytal as a sedative, and an enema.

''From this enema, large results were obtained. He was also to have additional sodium-amytal, a 3-grain dose, with atropin-sulphate at that time.

''At 9:00 o'clock in the morning—that would be the 29th—the case came to the surgery and was operated on on the 29th of April at 9:30 A. M., at St. Johns, under a general anesthetic.

''On that operation, incision was made in the right lower quadrant and a large amount of gas, fluid, pus, and fecal matter exuded, poured out; this was removed by suction.

''Examination of the region of the appendix showed that rupture had occurred at the proximal end of the appendix at the junction with the bowel and cecum.''

The appendix was sent to the Murray Hospital at Butte for analysis, and this analysis returned:

''Defendants Exhibit No. 2

St. James Hospital Laboratory

''Patient : Leonard Kelly—St. Johns Hospital
Surgeon : Dr. B. V. McCabe
Date : 5.5.36
Lab No : 48116
Tissue : Appendix
Gross : 60 x 10 mm
 Deep red, Hyperemic, Soft, club-shaped. Cov-

ered with a plastic exudate and contained an abscess near end.

Micro : All parts from the serosa to the mucosa showed an invasion of polymorphic cells and fibrin. There is much necrosis and sloughing.

Diagnosis : Acute, diffuse appendicitis and peritonitis.

J. G. Newman
Pathologist''

Such analysis appears in the record as defendant's Exhibit No. 2, was admitted in evidence without objection and certified up to this court. It will be adverted to later.

It is not contended that the piece of gauze was left in the abdomen at the time of either operation. The plaintiff admits he was in an unconscious condition for several days after the operations and obviously did not know what occurred immediately before or for several days after either of them. Furthermore, at each operation there were present, in addition to Dr. McCabe, Blanche M. Kahla, Josephine Kissinger, Sister Mary Rita, and Sister Mary Rachel, all registered and experienced nurses. All corroborate Dr. McCabe and each other as to what occurred at each operation as to the use of bandages and sponges, and it is very clear that no gauze or sponges could have been left in the wound at either operation. All were present at both operations. As to who were present and what was done we quote from the testimony of Blanche M. Kahla:

''Q. Are you a trained, or registered nurse? A. Yes, I am.

''Q. How long have you practised your profession? A. I graduated in 1935 and have practised off and on since that time.

''Mr. Shone: We will admit her qualifications as a graduate nurse, if she says she is.

''Q. I haven't indicated yet, though, whether you are single or a married woman. A. I am married.

''Q. Your maiden name was what? A. Blanche M. O'Connell.

''Q. Have you examined the original hospital chart covering

the operation made by Dr. McCabe on a patient by the name of Kelly on the 29th day of April, 1936? A. Yes, I have.

"Q. Have you, by the examination of that chart, determined whether you were present at that time? A. Yes, I was present.

"Q. Has such examination refreshed your recollection as to whether you were in the service of St. Johns Hospital at that time? A. Yes.

"Q. How long were you in the service of St. Johns Hospital? A. From the time the hospital opened, down in the Shodair Building, until 1939.

"Q. Now, with reference to the operation referred to, were you present in the operating room at the time of that operation? A. Yes, I was.

"Q. What was your position, or the part you took? A. I assisted Dr. McCabe.

"Q. You were designated the assistant nurse. A. Yes.

"Q. Additionally there would be what other nurses? A. The instrument nurse.

"Q. Who was she? A. Miss Josephine Kissinger.

"Q. Who else? A. The circulating nurse.

"Q. Who was she? A. Sister Mary Rita.

"Q. Were there others present? A. Sister Mary Rachel was anesthetist.

"Q. What, in a general way, are the duties of the assisting nurse? A. To help and do just what the doctor tells you to do.

"Q. Where is your station, with reference to the doctor, in the course of the operation? A. On the opposite side of the operating table.

"Q. Did you have occasion to, and did you, on this particular occasion, observe the operation? A. Yes, I did.

"Q. Can you say whether or not you were familiar with the gauze used by the doctor in that operation? A. Yes.

"Q. Can you say what those packs were that the doctor has described rather briefly? A. We call them ring rolls, or surgical packs.

540

"Q. They are made up prior to the time they arrive at the hospital? A. Yes, they are.

"Q. They come from some firms, or surgical house engaged in the business of furnishing them? A. Yes.

"Q. And those packs are how long, approximately? A. I would say about three feet.

"Q. And how wide? A. About four inches.

"The Court: You mean that is the length of the gauze that is put into them? A. No, that is after they are made up; they are that long after they are made up.

"Q. Now, after the fabric is made into a completed pack, what becomes of the edges? A. Those packs, when they come to us, the edges are all turned in and sewed down; they are sewed right down.

"Q. Now, we will go to the sponges. Were any sponges used in that operation? A. Why, the regular surgical sponge.

"Q. What is a regular surgical sponge? A. We call it an 8-inch sponge; it is about—I would say it is more than three inches wide but I don't recall exactly, two to four inches wide. They are folded in three layers and when they are opened up, they are quite long but I couldn't say just how long.

"Q. Are the inside edges folded in and sewed? A. They are not sewed, but fold under.

"Q. Do they come to the hospital from some outside source of supply? A. Yes, they do.

"Q. Who handles the sponges in the course of an operation? A. The instrument nurse hands them to the assistant or to the doctor.

"Q. How long were you there at St. Johns Hospital altogether, serving as surgical nurse or as assisting nurse? A. I served there until 1939 then I have served since in the new hospital in the surgery.

"Q. Can you say whether or not any other types or sizes of gauze were used on this particular operation? A. No, no other kind.

"Q. In the hospital state whether or not you ever saw pieces

of gauze used in connection with abdominal operations, an inch to an inch and a half wide? A. No."

The testimony of the other three nurses confirms that of Mrs. Kahla. There is no testimony or other evidence in material conflict with this testimony, except that of the plaintiff, his mother and Safronsky. If any gauze were placed and left in the operative incision it must have been placed and left there at some time subsequent to the first operation by some one of the numerous persons including the plaintiff's mother who dressed the wound from time to time. Dr. McCabe testified to having dressed the wound some fifty or more times, both at the hospital and his office; Dr. Flinn testified to having dressed the wound some ten or more times at the hospital; all dressing at the hospital was in the presence of one or more nurses; the plaintiff testified that his mother dressed the wound at home at various times. On cross-examination he was asked if he had not testified in a former case, *Kelly* v. *Montana Power Co.*, 111 Mont. 118, 106 Pac. (2d) 339, as follows: "My mother dressed my wounds all of the times ever since April, 1936, through 1937 and until November, 1937; she dressed them continuously." Plaintiff answered over objection that he remembered testifying but not in the exact words, but in substance to that effect.

Dr. McCabe was asked if he examined the wound at the various times of dressing. He answered, "Externally, yes; internally no." On cross-examination he was asked as to how he cleansed the wound, to which he answered, "Why, I simply mopped off the discharge from the abdominal wall with a sponge, which is made of gauze similar to that used all through the case, cleansed it off, maybe painted it with a little something to kill the odor and promote the healing of the skin, * * * covered it with dressing and put on the binder." He further testified:

"Q. Now, did you clean inside at any time after the first operation and up to the second operation? A. Absolutely not, no.

"Q. You never cleansed the inside of the abdomen, or wound at all? A. I never was inside of the abdominal cavity following

the first operation, until I reopened the abdominal cavity to make the second operation.

"Q. Then, after the second operation, did you cleanse the wound inside of the abdomen in any way? A. I never entered the abdomen at all.

"Q. Now, doctor, after the first operation, on two different occasions, prior to the second operation, Mr. Kelly was in your office, you took the bowel out, did you not? A. No, I didn't.

"Q. What did you do on those two occasions? A. On one of those occasions, I simply took a ligature on the needle holder and tried to draw the edges of the cecum, where the break was, together. I used linen at that time, linen thread.

"Q. On the other occasion what did you do? A. The same thing.

"Q. Was Mrs. Kelly there with her son on those occasions? A. I think she was there on one of the occasions; whether she was there on both, I don't know. We don't, usually, have a lot of spectators around when we are doing surgery.

"Q. How do you usually put gauze into the inside of a wound for drainage purposes? A. We don't put any in.

"Q. Or for cleansing purposes? A. Cleansing the inside of the wound?

"Q. Yes. A. You don't attempt to cleanse the inside of a wound. * * *

"Q. You want the court now to understand, Dr. McCabe, that at no time while Mr. Kelly came to your office after the first operation, and also after the second operation, that you never placed any gauze of any kind inside of that incisive wound? A. Exactly, yes.

"Q. You want the court to understand that? A. Yes."

Dr. Berg testified that he treated the plaintiff from some time in March 1937 until in August the same year, dressing the wound about twenty times. The wound was suppurating more or less all the time and a short time after the plaintiff came to him the wound broke and a large amount of pus came out. He saw no gauze or other foreign matter in the wound during his treatment.

Dr. Gallivan testified that he first treated the patient in the spring of 1936. (This was during the time the plaintiff was under the care of Doctors McCabe and Flinn.) He could not fix the date definitely, having changed offices in the meantime but "probably a couple of months after the appendectomy in which the appendix was removed." Dr. Gallivan told the plaintiff at that time that he had a fecal fistula. "I explained to him those fecal fistulas happened after ruptured appendices very frequently and to go back to his doctor again and he would finish it up. * * * The wound was infected because the bowel content was coming through * * *. November 15, 1937, he came to the office again and stated he had had another operation in which the bowel was closed and the incision closed and, after having been under the care of his physician for some time, he had consulted another doctor who had dressed the wound for a while, but it still continued to drain a considerable amount of pus, from the wound.

"At that time he was examined and there were three small openings in the scar tissue of the wound; they were very small, pin points, each one draining a small amount.

"A small amount of iodized oil was injected into the opening to see how extensive an area was undermined or was underneath it, to try to demonstrate whether there was any connection with the bowel at that time. These three small openings were connected with incision under local anesthesia and the oil there drained through the area in the skin, or in the scar, which was in the hope the whole thing would fill in.

"The wound did gradually get smaller and the wound closed except for one small opening which continued to drain; simply each day he came in for dressings there would be purulent matter on the gauze. He was given care and dressings and the wound was watched from November 15 on up into February.

"One day, toward the end of February, I was dressing the wound * * *

"Q. That was February of what year? A. 1938. One day while dressing the wound late in February, I passed a small forceps, called mosquito forceps, very small, into the wound to

probe it to see how deep the tract was, and to see if it was apparently filling in. As I pulled out the forceps a small cotton thread came out on the forceps. I probed it some more but could find no more in there and then dressed the wound that day.

"Then I got the thought that perhaps there might be some foreign material in there, or foreign body in there that might be keeping this wound open and draining. So we talked it over and decided that we had treated it conservatively long enough and if it was going to close it should close and perhaps there was some reason there for it remaining open. So, I advised him that he should have some operative work and on March 1st, he was operated at St. Johns Hospital.

"I was alone at that time and I asked Dr. Cooney of Helena, to come down and assist me at the operation. The wound was opened and explored, the abdomen was opened and the sinus dissected down to the bowel, found connected to the bowel; it was removed from the bowel and the bowel was closed. The entire abdomen was explored, explored from the liver right to the pelvis and we could find no other foreign body there.

"We incised a lot of heavy scar tissue around the wound, very, very dense, almost like gristle, or cartilage. We cleaned it out, sutured it, and closed the wall.

"His course after the operation was stormy. From the operation he was awfully sick; the wound broke open because of infection that apparently had lurked in the wound, and drained a large amount. His abdomen blew up with a lot of distension and for a few days he was quite ill. He gradually improved and was finally discharged from the hospital but he still had some draining from the wound.

"I watched the wound for a period of at least a few months and it was hoped the tissues were gradually repairing and filling up from the bottom. The last time I saw him there was still a small sinus tract from the wound.

"Q. How big was the wound when the thread was taken out, as you have testified? A. Well, just large enough for what we

call a small mosquito forceps to go in, not quite as big around as a lead pencil, about half that size, maybe.

"Q. State whether or not you did, at that time, remove any piece of gauze from that wound? A. No, there was just a thread.

"Q. You characterize it as a cotton thread. A. That is what it appeared to be.

"Q. What did you do with the thread? A. I just laid it on the dressing and when I threw the dressings out, I threw it away with the dressings.

"Q. Now, if you had removed a piece of gauze six inches in length and approximately a half inch in width from the wound that day, state whether or not you would have remembered it? A. Yes, sir, I would have.

"Q. State whether or not any foreign matter, outside of pus, was removed from the wound that day, outside of a single cotton thread? A. That is all.

"Q. How long was this single cotton thread, Dr. Gallivan? A. It wasn't measured but, I imagine about six inches long.

"Q. State whether it would have been possible to have removed a sponge through a hole of that size. A. No. it wouldn't have been possible.

"Q. Would it have been possible to have removed a gauze such as has been referred to, through that hole? A. The thread?

"Q. No, not the thread, no a piece of gauze.

"The Court: Six inches long by a half inch wide. A. No, you couldn't have. This hole was just about half the size of a lead pencil, just big enough for the mosquito forceps to go in.''

Dr. Gallivan treated the plaintiff for approximately a year from November, 1937, until November, 1938. The situation at that time and what was done is here presented by quoting plaintiff's testimony:

"Q. How long did Dr. Gallivan treat you after this operation? A. Until in November, 1938.

"Q. During that period the wound required daily, semiweekly, or tri-weekly dressings? A. Yes.

"Q. During that entire time there wasn't any improvement at all insofar as the discharge from the wound was concerned? A. No, there wasn't.

"Q. Then you left Dr. Gallivan and sought advice from the Thompson, Klein, Cashmore clinic. What interval elapsed between the time you left Dr. Gallivan and went to Dr. Thompson's firm? A. There wasn't any interval because I went out of Dr. Gallivan's office, across the street, and into Drs. Thompson, Cashmore, and Klein's office.

"Q. When were you operated on after the Thompson, Klein and Cashmore clinic undertook your treatment? A. About two days later.

"Q. You had a first, or preliminary, operation which was sometime in November, 1938? A. November, yes.

"Q. And that was made under general anesthetic. A. Yes.

"Q. So, you don't know what they did? A. No. I don't.

"Q. And then in January, 1939, there was a second operation made by the same doctors? A. Yes.

"Q. And on that occasion there was some plastic surgery done. Do you know what that means? A. No, I don't."

Dr. Cooney assisted Dr. Gallivan in the operation and testified as follows:

"Q. Did you know Dr. Gallivan was operating in order to see if there were any foreign objects in the abdomen? A. No, it never entered into it; I have no recollection of a foreign body ever being discussed.

"Q. You didn't know that was why he was operating. A. No, it was for a fistula."

In considering the question of the defendant's liability as ▮ alleged in the complaint, we proceed under the rule so ably expressed by Chief Justice Brantly in the case of *Ellinghouse* v. *Ajax Livestock Co.*, 51 Mont. 275, 283, 152 Pac. 481, 484, L. R. A. 1916D, 836, where it is said: "It is elementary that, when a plaintiff seeks recovery for actionable negligence, his complaint must allege facts showing these three elements: (1) That the defendant was under a legal duty to protect him from the injury

of which he complains; (2) that the defendant failed to perform this duty; and (3) that the injury was proximately caused by defendant's delinquency. All of these elements combined constituted the cause of action; and if the complaint fails to disclose, directly or by fair inference from the facts alleged, the presence of all of them, it is insufficient, for it fails to state the facts constituting a cause of action.'' The application of the rule in that case as stated by the Chief Justice was on the question as to the sufficiency of the complaint to state a cause of action but the rule is equally applicable where, as here, the question is on the sufficiency of the evidence to sustain the allegations of the complaint and the judgment rendered in the case.

The five assignments of error in the case at bar were on the court's making and entering judgment in favor of the defendant; that the findings of fact are against the evidence; that the preponderance of evidence is against the conclusions of law; that the evidence is insufficient to support the findings or conclusions; and that the judgment is clearly against the weight of evidence. Under these assignments it is necessary for us to determine but one question, namely, is the evidence as shown by the record sufficient to sustain the judgment?

The Court made findings in part as follows:

''3. That plaintiff was seized with an attack of acute appendicitis on Sunday, April 26, 1936, while engaged in the course of his employment by the Montana Power Company; in Lewis and Clark County, Montana.

''4. That plaintiff presented himself for medical treatment at the office of said Flinn in the city of Helena, Montana, on Tuesday, the 28th day of April, 1936, and because of the absence of said Flinn from the State, defendant, who was a partner of said Flinn in the practice of medicine, operated upon plaintiff the following morning, at which time plaintiff was found to be suffering from acute peritoneal infection, caused by and due to a ruptured appendix, and that said operation disclosed that said infection had been present for several days prior to said 28th day of April, 1936.

"5. That thereafter plaintiff was under the care of defendant and said Dr. J. M. Flinn, and that the operative wound on plaintiff's abomen was slow in healing, due to the infection that existed at the time of said operation, which had broken down the muscles and tissues of the abdomen, and that said wound refused to heal, and remained open and draining.

"6. That a second operation was performed on plaintiff by the defendant on the 11th day of August, 1936, in an attempt to close a fistula which had developed in said operative wound, and thereafter said wound gradually healed until it was entirely closed.

"7. That defendant and said Dr. J. M. Flinn dressed said wound on many different occasions, but at no time did said defendant or said Dr. J. M. Flinn permit any strip or piece of gauze approximately six inches in length and one-half inch in width to remain in said wound.

"8. That no piece or strip of gauze was removed from said wound by Dr. E. L. Gallivan on or about the 20th day of February, 1938, or at any other time.

"9. That the operative incision or wound did not become infected as a result of any strip or piece of gauze deposited or left in the wound by reason of the negligent act or omission of the defendant, or otherwise, and that the infection in plaintiff's abdomen was directly due to and caused by the ruptured appendix and peritonitis present at the time plaintiff first presented himself to defendant." These findings are clearly supported by a preponderance of the evidence.

The conclusions of law were in full accord with the findings, and decree was made and entered in accord with both.

The plaintiff, his mother and his boyhood friend, Ralph E. Safronsky, gave testimony strongly sustaining the contention of the plaintiff that gauze was "poked" into the operative wound. The testimony of Dr. Cashmore chiefly relates to the operation made by his firm, and is not particularly pertinent to any controverted question. It is important, however, in showing that when the patient came to them the wound was still dis-

charging pus to some extent. The testimony of Doctors McCabe, Flinn, Berg, Gallivan and Cooney is in sharp conflict with the testimony of plaintiff's witnesses; much of the testimony of the five physicians and surgeons is in flat contradiction of the testimony of plaintiff's witnesses. It will be remembered that the plaintiff's cause is grounded upon the allegation and contention that defendant placed a strip of gauze, approximately six inches long and one-half inch wide in plaintiff's abdomen through the operative wound and failed to remove the same, and that such negligence was the cause of the long period of suffering the plaintiff had to endure, resulting in numerous operations and great pain and expense. Plaintiff contends that Dr. Gallivan, while treating him some two years or more after his first operation by the defendant, discovered and removed the strip of gauze mentioned, and remarked at the time that such gauze was no doubt the cause of plaintiff's trouble, and he would thereafter improve; Dr. Gallivan, as is shown by his testimony copied herein, did not make any such statement to the plaintiff, and took from the operative wound not a piece of gauze the size mentioned, but a single thread about six inches long. If this thread was the cause of the long continued suppuration of plaintiff's abdominal wound, its removal does not appear to have resulted in the cessation of the flow of pus. Pus was still escaping from the wound when plaintniff was operated on by Doctors Thompson, Klein and Cashmore. We think that the testimony of all the physicians and the analysis of the ruptured appendix made by the pathologist at St. James Hospital conclusively establish the fact that the ruptured appendix was gangrenous at the time of plaintiff's first operation by Dr. McCabe and the long illness following was due to the resultant infection that pervaded plaintiff's whole system. We are unable to see how the trial court could have arrived at any other conclusion in the premises. There is nothing in the record to show or even indicate that Dr. McCabe did not at all times care for and treat the plaintiff with that reasonable care and skill required in the premises.

The plaintiff has not established his case in accordance with the ▮ rule laid down in case of *Ellinghouse* v. *Ajax Livestock Co.,* supra. The action at bar is controlled by the general rule applied in the following cases:

"In a law action, tried to the court, * * * upon appeal from the judgment, for alleged insufficiency of the evidence, a judgment based on conflicting evidence will not be disturbed if the evidence of the prevailing party [be] substantial and sufficient to justify the judgment." (*Davey* v. *Davey,* 81 Mont. 375, 263 Pac. 415, 417; *Goldsmith* v. *Murray,* 48 Mont. 337, 138 Pac. 187; *Komposh* v. *Powers,* 75 Mont. 493, 244 Pac. 298; *Evans* v. *Silver Bow Motor Car Co.,* 96 Mont. 156, 29 Pac. (2d) 381; *Kenison* v. *Anderson,* 83 Mont. 430, 272 Pac. 679.)

The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANDERSON and ERICKSON concur.

MR. JUSTICE ADAIR, concurring specially:

This is a law action wherein the parties waived a jury and tried the cause to the court. In such a case the findings of the trial court on questions of fact have the force of a verdict. Here much of the evidence is conflicting and the resolution of such conflicts was for the trial court whose findings therein will not be disturbed on appeal unless clearly wrong or against the preponderance of the evidence. While it was the duty of the trial court to weigh the evidence, yet it is not proper for this court to pass upon such weight and, on the conflicting evidence presented by the record herein, I do not think that this court is in a position to pass upon the credibility of the various witnesses or to say that the testimony of one set of witnesses "conclusively establishes" any pathological condition or fact in connection with proximate cause of plaintiff's injury or loss. It cannot be said that the evidence clearly preponderates against the trial court's finding and judgment or that they are clearly wrong or erroneous, for which reasons alone I concur in the result but not in all that is said in the foregoing opinion of the court.